# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 06-795V
Filed: March 11, 2015
(Not to be Published)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
ROBERT BEVILL and                         *
JANICE BEVILL, parents and                *
natural guardians of V.B., a minor,       *
                                          *    Autism; Statute of Limitations;
                  Petitioners,            *    Untimely Filed; Equitable Tolling
                                          *    Doctrine.
         v.                               *
                                          *
SECRETARY OF HEALTH AND                   *
HUMAN SERVICES,                           *
                                          *
                  Respondent.             *
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

*Richard Gage*, Cheyenne, WY, *for Petitioners*.
*Linda Renzi*, U.S. Department of Justice, Washington, DC, *for Respondent*.

### DECISION

On November 27, 2006, Robert and Janice Bevill ("Petitioners"), on behalf of their daughter, V.B., filed a claim for compensation pursuant to the National Vaccine Injury Compensation Program ("Vaccine Program").[1] (Petition.)

The question at issue is whether this case was timely filed under the Vaccine Act's statute of limitations. § 16(a)(2). Based on my analysis of the evidence, I conclude that this case was not timely filed, and thus *this case is dismissed as untimely filed.*

### I

### BACKGROUND: THE OMNIBUS AUTISM PROCEEDING

**A.** *General*

This case is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorder" ["ASD"] were caused by one or more vaccinations. A special proceeding known as the Omnibus Autism Proceeding ("OAP") was developed to manage these cases within the Office of Special Masters ("OSM"). A

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2006 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2006 ed.)

detailed history of the controversy regarding vaccines and autism, along with a history of the development of the OAP, was set forth in the six entitlement decisions issued by three special masters as "test cases" for two theories of causation litigated in the OAP (see cases cited below), and will only be summarized here.

A group called the Petitioners' Steering Committee ("PSC") was formed in 2002 by the many attorneys who represented Vaccine Act petitioners who raised autism-related claims. Their responsibility was to develop any available evidence indicating that vaccines could contribute to causing autism, and eventually present that evidence in a series of "test cases," exploring the issue of whether vaccines could cause autism, and, if so, in what circumstances. Ultimately, the PSC selected a group of attorneys to present evidence in two different groups of "test cases" during many weeks of trial in 2007 and 2008. In the six test cases, the PSC presented two separate theories on the causation of ASDs. The first theory alleged that the *measles* portion of the measles, mumps, rubella (MMR) vaccine could cause ASDs. The second theory alleged that the mercury contained in *thimerosal-containing vaccines* could directly affect an infant's brain, thereby substantially contributing to the causation of ASD.

Decisions in each of the three test cases pertaining to the PSC's *first* theory rejected the petitioners' causation theories. *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd* 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Synder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).[2] Decisions in each of the three "test cases" pertaining to the PSC's *second* theory also rejected the petitioners' causation theories, and the petitioners in each of those three cases chose not to appeal. *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

Thus, the proceedings in the six "test cases" concluded in 2010. Thereafter, the Petitioners in this case, and the petitioners in other cases within the OAP, were instructed to decide how to proceed with their own claims. The vast majority of those autism petitioners elected either to withdraw their claims or, more commonly, to request that the special master presiding over their case decide their case on the written record, uniformly resulting in a decision rejecting the petitioner's claim for lack of support. However, a small minority of the autism petitioners have elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses. A few such cases have gone to trial before a special master, and in the cases of this type decided thus far, all have resulted in rejection of petitioners' claims that vaccines played a role in causing their child's autism. In none of the post-test case rulings has a special master or judge found any merit in an allegation that any vaccine can contribute to causing autism.

## B. Relevance of OAP to this case

---

[2] The petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.

This case, however, is quite *different* from the OAP cases cited in Section I(A) of this Decision.  The issue addressed in this Decision is *not* whether vaccines *caused* V.B.'s autism.  The question addressed here, rather, is whether this petition was *timely filed*.  I include this description of the OAP, therefore, *only* to show why this case, filed in 2006, was not processed in the usual manner of non-autism Program cases.  Because this case involved a child who had been diagnosed with a form of autism, the processing of this case was *delayed*, at Petitioners' request, along with the other thousands of autism cases, to await the final outcome of the autism "test cases".  Then, when the "test cases" were finalized in 2010, individual petitioners such as the Bevills were given a generous period of time to decide whether to abandon their claims or to develop a theory of their own case.

Thus, the *sole* issue that I address in this case does *not* concern whether V.B.'s autism was vaccine-*caused*, but *only* whether this petition was *timely filed*.

## II

## PROCEDURAL HISTORY OF THIS CASE

On November 27, 2006, Petitioners filed a "Short-Form Autism Petition for Vaccine Compensation," on behalf of their daughter, V.B., under the Vaccine Act.[3]  The *pro se* Petitioners provided no specific details at that time regarding the nature of the alleged vaccine-related injury.  On December 6, 2006, further proceedings in this case were deferred pending the outcome of the OAP "test cases."  (Notice, filed Dec. 6, 2006.)

On March 1, 2007, pursuant to Vaccine Rule 4(c), Respondent filed a report in response to Petitioners' claim, stating that the record to date was deficient.

On February 13, 2009, I ordered Petitioners to file certain medical records, and in response, Petitioners filed various medical records[4] on May 20, 2009.

On July 1, 2009, Respondent filed a Motion to Dismiss, contending that Petitioners' claim was filed after the expiration of the statute of limitations.  On July 22, 2009, Petitioners filed an opposition to Respondent's Motion to Dismiss.

---

[3] By filing the Short-Form Autism Petition for Vaccine Compensation, the Petitioner, in effect, alleged that:

> [a]s a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder or a similar disorder.  This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B (HIB) vaccinations; or by some combination of the two.

(*Autism General Order #1*, 2002 WL 31696785 at *8 (Fed. Cl. Spec. Mstr., July 3, 2002).)

[4] Petitioners filed Exhibits A through F on May 20, 2009.  Other exhibits were filed at various times thereafter, also identified with letters of the alphabet.  I will refer to these exhibits as Pet. Ex. A, Pet. Ex. B, etc.

On December 2, 2010, I ordered Petitioners to provide a statement, within 30 days, identifying their theory of how V.B.'s vaccines caused her autism, followed by an expert report within 90 days.  On January 3, 2011, Petitioners filed a motion for a stay of proceedings, pending the outcome of a case then before the U.S. Supreme Court.[5]  Petitioners filed a general description of their theory of vaccine causation on January 6, 2011.  On January 20, 2011, I filed an Order indicating that Petitioners would not be required to file anything further until instructed to do so.

In August of 2012, attorney Richard Gage became counsel of record for the Petitioners.

On August 2, 2012, I filed an Order deferring my ruling on Respondent's motion to dismiss the petition for untimeliness.  That Order also instructed Petitioners to file the report of their medical expert.

Petitioners filed an expert report of Dr. Andrew Zimmerman on May 22, 2013 (*see* Pet. Ex. I), along with various medical records (Exs. G, H, J, K, L, and M).  Petitioners filed additional exhibits on June 27, 2013, and February 11, 2014, and on May 9, 2014, they filed two expert reports of Dr. Mary Megson.

Respondent filed additional evidence, designated as Respondent's Exhibits A through E, on August 18, 2014.[6]

Respondent filed a renewed Motion to Dismiss this case, again alleging untimely filing, on August 19, 2014.  Petitioners filed a Response to that motion on September 18, 2014.

## III

## FACTUAL HISTORY

V.B. was born on December 4, 2001. (Pet. Ex. A, p. 16.)    Dr. Gregory Williams assessed V.B. on October 30, 2002, when she was eleven months old, observing that V.B. "is not doing much in terms of motor development… [s]he is not walking, not crawling… [s]he says 'Da-Da', no other words." (Pet. Ex. A, p. 7.)  As part of his assessment, he noted " ? gross motor delay." (*Id*.)  Three months later, on February 7, 2003, Dr. Williams recorded that V.B. was "still crawling most of the time, not cruising too much * * * [s]ays momma and dada, and baby, but a little bit slow." (Pet. Ex. A, p. 5.)  Dr. Williams' impression was that "she may have a gross motor delay, it's probably mild, and there may be a mild language delay."  (*Id*.)

There are no contemporaneous reports in the medical record for the next 21 months, between February 2003 and November 2004.  On December 2, 2004, V.B. was examined by pediatrician Dr. Ann Dobbins, who noted that V.B. had "normal growth & development until about 1 year ago was speaking--now [without] speech--[symptoms] worse in July." (Pet. Ex. D,

---

[5] That case was *Bruesewitz v. Wyeth LLC*, 131 S.Ct. 1068 (2011), in which a decision issued on February 22, 2011.

[6] I will refer to Respondent's exhibits as Resp. Ex. A, Resp. Ex. B, etc.

p. 5.) Dr. Dobbins also recorded that V.B. "doesn't play [with] other children." (*Id.*) In the "Assessment" section of this note, Dr. Dobbins recorded the acronym "PDD."[7] (*Id.*)

Dr. Dobbins referred V.B. to neurologist David Urion, at Boston Children's Hospital, who examined her on January 3, 2005.[8] (Pet. Ex. E, p. 3.) Dr. Urion wrote as follows:

> In retrospect, early milestones were all achieved within the usual timeframes, but language milestones were significantly delayed. By 2 years of age she only had a single word utterance, mama, which was not preserved and was subsequently lost. Since that time she has essentially gained no new words * * *.

(*Id.*) He opined that her condition seemed to fit within the spectrum of a "pervasive developmental disorder." (*Id.*) On March 8, 2005, Dr. Urion stated that V.B "is a young woman with a very significant language and communication disorder that probably falls within the spectrum of an autism spectrum disorder." (Pet. Ex. E, p. 7.)

On April 14, 2006, Dr. Pamela Hofley examined V.B. and recorded that "Her past medical history is significant for her autistic behavior. She has been diagnosed with autism spectrum disorder with PPD. Symptoms started to arise at about 15 months and became very apparent by age two and two and a half." (Pet. Ex. C, p. 3.)

At this point, there is a three-year chronological gap in the medical record, until March 13, 2009. On that date, V.B. was evaluated by neurologist Shafali Jeste, who recorded:

> [A]ccording to her parents [V.B.] had typical development until age 2.5 when they felt as though she profoundly regressed. Mom says that in the first 2.5 years of life she was babbling, and even had some words such as 'mommy, daddy, uh-oh" and had typical motor development as well. She was social and had good eye contact, and had no repetitive behaviors. Mom says that around age 2.5 she completely stopped talking and started exhibiting many repetitive behaviors such as hand flapping and twisting her fingers.

(Pet. Ex. H, p. 1.)[9]

Dr. Ann Neumeyer, a specialist at the Massachusetts Lurie Family Autism Center, examined V.B. on June 15, 2010, and recorded the following developmental history: "[A]t 12 months, she had a couple of words, but by 2.5 she didn't talk much, and she seemed to lose much of her language. By three she was silent." (Pet. Ex. Q, p. 2.)

---

[7] It appears likely, in the context of this medical record, that "PDD" is an abbreviation for "pervasive developmental disorder."

[8] I note that in various exhibits, subsequent treating physicians refer to a "diagnosis" of autism by Dr. Urion specifically in November 2005. (See Pet. Ex. T, p.1; Pet. Ex. L, p. 1.) There are no notes or reports by Dr. Urion in the medical record for November 2005.

[9] Respondent's Renewed Motion to Dismiss, filed on August 19, 2014, does not mention any of Petitioners' Exhibits that were filed after Pet. Ex. F. Those exhibits contain many statements regarding onset that must be considered.

On May 2, 2012, Dr. Mark Korson evaluated V.B.  He recorded that "[a]round the age of 2.5 years, [V.B.] demonstrated rocking behaviors, flapping of her arms, twisting of her fingers.  Occurred periodically, not in response to any stimulation or trigger." (Pet. Ex. T, p. 1.)  He also noted that her condition might be related to mitochondrial disease. (*Id*., pp. 5-6.)  On September 26, 2012, Dr. Katherine Sims, who specializes in neurogenetics and mitochondrial disorders, also concluded that V.B. had a "possible mitochondrial disorder." (Pet. Ex. L, p. 4.)

On December 5, 2012, Dr. Andrew Zimmerman examined V.B. and noted that "Regression took place in [V.B.] at 30 months of age with onset of crying, light sensitivity, and constipation.  There was no specific temporal relationship to vaccines (or illness) which were given according to the usual regimen at that time." (Pet. Ex. I, p. 2.)  He summarized that V.B "has autism following regressive encephalopathy at 30 months of age and has been found to have a mitochondrial dysfunction based on a muscle biopsy (with Complex I and III deficiencies) while other metabolic and genetic testing has been normal." (Pet. Ex. I, p. 3.)  On March 7, 2014, Petitioners filed the expert report of Dr. Zimmerman, which again described V.B.'s condition as "autism and a mitochondrial disorder."  (Pet. Ex. W, p. 1.)   Dr. Zimmerman also noted V.B.'s "history of normal development until 30 months of age, followed by regression at 30 months of age, with onset of crying, light sensitivity and constipation, leading to the diagnosis of autism." (*Id*.)  He concludes that, "[a]lthough there was not a clear temporal relationship between immunizations and onset of regression and autism in [V.B.], it is more likely than not that she was vulnerable to regression due to the mitochondrial disorder." (*Id*., p. 2.)

## IV

## DIAGNOSTIC CRITERIA FOR AUTISM SPECTRUM DISORDERS

Concerning this issue, I have relied upon the information submitted by Respondent in this case on August 19, 2014, much of which is drawn from OAP test case testimony provided by three pediatric neurologists with considerable experience in diagnosing ASDs. (*See* Resp. Ex. C, pp. 1242A-86A; Resp. Ex. D, pp. 1566a-1644; Resp. Ex. E, pp. 3236-64.)  I further note that a lengthy discussion of this issue was first compiled and published by my colleague, Special Master Vowell, in *White v. HHS,* 04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011.)

The terms "autism" and "autism spectrum disorder" have been used to describe a set of developmental disorders characterized by impairments in social interaction, impairments in verbal and non-verbal communication, and stereotypical restricted or repetitive patterns of behavior and interests. (*See Cedillo,* 2009 WL 331968, at *7 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) (an OAP "test case").) The specific diagnostic criteria for ASDs are found in the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 4th ed. text revision 2000 ("DSM-IV-TR")),[10] the manual used in the United States to diagnose dysfunctions of the brain. (*See* Resp. Ex. C, p. 1278A.) The manual identifies the behavioral symptoms recognized

---

[10] I am aware that the American Psychiatric Association has recently released the *fifth* edition of the DSM, and that the DSM-V has somewhat revised the diagnostic criteria pertaining to Autism Spectrum Disorders.  However, based upon my review of this revision to the DSM, it appears that the *basic* criteria for diagnosing ASDs are *not* substantially changed from the DSM-IV. (The Petitioners in this case have not offered any evidence in response to the evidence supplied by Respondent concerning the diagnostic criteria for ASDs.)

by the medical profession as symptoms of ASD. The DSM-IV-TR contains specific diagnostic criteria for the various disorders within the autism spectrum, including "autistic disorder," "Asperger's disorder," and "pervasive developmental disorder-not otherwise specified" (most frequently referred to as "PDD-NOS").[11]  It is not uncommon for parents and even health care providers to use these terms in non-specific ways, such as referring to a child as having an "autism diagnosis," even though the specific diagnosis is PDD-NOS.  The term "autism" is often used to refer to *any* of the five disorders within the ASD spectrum.  Of note, a child's diagnosis within the autism spectrum may change from "autistic disorder" to PDD-NOS (or vice versa) over time.

### *A. Diagnosing Autism Spectrum Disorders*

The behavioral differences present in persons with autism spectrum disorders encompass not only delays in development, but also qualitative abnormalities in development. (Resp. Ex. C, p. 1264A; Resp. Ex. D, pp. 1589-91.) There can be wide variability in children with the same diagnosis. One child might lack any language at all, while another with a large vocabulary might display the inability to engage in a non-scripted conversation. (Resp. Ex. D, pp. 1602A-1604.) However, both would have impairment in the *communication* domain.

Testing for the presence of an ASD involves the use of standardized lists of questions about behavior directed to caregivers and parents, as well as observations of behaviors in standardized settings by trained observers. (Resp. Ex. C, pp. 1272A-74A.)  As one expert explained, in diagnosing an ASD, "we try to observe symptoms, and when we have observed enough symptoms, then we see if the child meets these criteria."  (Resp. Ex. C, pp. 1278A-79; *see also* Resp. Ex. E, pp. 3253-54 (describing diagnostic instruments and their use in clinical settings).)

Typically in children with autism spectrum disorders, the symptoms have been present for weeks or months before parents report them to health care providers. (Resp. Ex. C, p. 1283.) The most common age at which parents *recognize* developmental problems, usually problems in communication or the lack of social reciprocity, is at 18 to 24 months of age. (Resp. Ex. E, pp. 3259-60.) The development of symptoms of an ASD usually occurs very gradually, and it is not uncommon for the parents to be unable to date the onset very precisely. (Resp. Ex. C, pp. 1285A-1286A.)

### *1. Autistic Disorder*

A diagnosis of "autistic disorder," sometimes described as "classical autism," requires a minimum of six findings, from a list of impairments divided into three categories, known as "domains," of impaired function: (1) social interaction; (2) communication; and (3) restricted, repetitive, and stereotyped patterns of behavior, interests, and activities.  Furthermore, the abnormalities in development must have occurred before the age of three. (Resp. Ex. C, p 1264A, 1279; Resp. Ex. D, p. 1618; Resp. Ex. E, p. 3250.)

---

[11] Besides the above-named three types of ASDs, there are two other categories of ASDs listed in the DSM-IV-TR-- *i.e.*, Child Disintegrative Disorder and Rett's Syndrome.  However, in the text above I will describe only the three types.  Symptoms in the other two types are generally similar, but have some differences not relevant to this case.

7

### 2. *Pervasive Developmental Disorder-Not Otherwise Specified*

The DSM-IV-TR defines PDD-NOS as a "severe and pervasive impairment in the development of reciprocal social interaction," coupled with impairment in either communication skills or the presence of stereotyped behaviors or interests. (DSM-IV-TR, p. 84.) The diagnosis is made when the criteria for other autism spectrum disorders, or other psychiatric disorders, such as schizophrenia, are not met. (*Id.*) It includes what has been called "atypical autism," which includes conditions that present like "autistic disorder," but with onset after age three, or which fail to meet the specific diagnostic criteria in one or more of the domains of functioning. (*Id.*) As was noted in the *Dwyer* OAP test case, this is the most prevalent of the disorders on the autism spectrum. *Dwyer*, 2010 WL 892250, at *30.

### 3. *Asperger's Disorder*

Asperger's Disorder, also known as "Asperger's syndrome," is a form of high-functioning autism. Though often the individual functions at a high *cognitive* level, the disorder presents with significant abnormalities in social interaction and with restricted, repetitive, and stereotyped patterns of behavior, interests, and activities. (*See* DSM-IV-TR, p. 84.)

## B. *The three domains of impairment, and behavioral symptoms in each domain*

### 1. *Social Interaction domain*

This domain encompasses interactions with others. (Resp. Ex. C, p. 1264A.) There are four subgroups within this domain. (Resp. Ex. D, p. 1594.) The subgroups include: (1) a marked impairment in the use of nonverbal behavior, such as gestures, eye contact and body language; (2) the failure to develop appropriate peer relations; (3) marked impairment in empathy; and (4) the lack of social or emotional reciprocity. (*Id.*, pp. 1594-96.) To be diagnosed with "autistic disorder," the patient must have behavioral symptoms from two of the four subgroups. (*Id.*, p. 1594.) For an Asperger's diagnosis, there must be two impairments in this domain as well. (DSM-IV-TR, p. 84.) Children who do not display "the full set of symptoms" are diagnosed with PDD-NOS. (Resp. Ex. C, p. 1275A.) Symptoms used to identify young children with impairments in the social interaction domain include lack of eye contact, deficits in social smiling, lack of response to their name, and the inability to respond to others. (Resp. Ex. C, pp. 1269A-70A.)

### 2. *Communication domain*

The communication domain involves both verbal and non-verbal communication, such as intonation and body language. (Resp. Ex. C, p. 1263; Resp. Ex. D, p. 1602A.) Language abnormalities in ASD encompass not only delays in language acquisition, but the lack of capacity to communicate with others. (Resp. Ex. C, p. 1267A.) Impaired communication abilities are one of the "most important and early recognized symptoms" of autism. *Dwyer,* 2010 WL 892250 at *31.

8

There are four criteria within the communication domain. (Resp. Ex. D, p. 1602A.) They include: (1) a delay in or lack of development in spoken language, without the use of signs or gestures to compensate; (2) problems in initiating or sustaining conversation; (3) stereotypic or repetitive use of language, including echolalia and repeating the script of a video or radio presentation, such as singing a commercial jingle; and (4) the lack of spontaneous imaginative or make-believe play. (*Id.*, pp. 1602A-05.)

Language delay, limited babbling, lack of gestures, lack of pointing to communicate things other than basic wants and desires, are all early symptoms used to diagnose impairments in the communication domain. (Resp. Ex. C, pp. 1266A-68A.)

*Speech and language delays are the symptoms most commonly reported by parents as a concern leading to a diagnosis of ASD.* (Resp. Ex. C, p. 1284 (one of first concerns noted by parents is the lack of language development); Resp. Ex. E, p. 3253 (problems in social and communication domains tend to be observed much earlier than stereotyped behaviors).)

### *3. Restricted, repetitive and stereotyped patterns of behavior domain*

There are four categories of behavioral characteristics within this domain. They include (1) a preoccupation with an interest that is abnormal in intensity or focus, such as spinning a plate or a wheel or developing an intense fascination with a particular interest, such as dinosaurs, cartoon characters, or numbers; (2) an adherence to nonfunctional routines or rituals, such as eating only from a blue plate, sitting in the same seat, or walking the same route; (3) stereotypic or repetitive motor mannerisms, such as finger flicking, hand regard, hand flapping, or twirling; and (4) a persistent preoccupation with parts of an object, such as focusing on the wheel of a toy car and spinning it, rather than playing with the toy as a car. (Resp. Ex. D, pp. 1613A-15; Resp. Ex. C, pp. 1271A-72A.)

### *C. Summary*

The evidence, as filed into the record of this case (Resp. Exs. A through E), establishes that a diagnosis of ASD is based on observations of behavioral symptoms. The symptoms are categorized into three domains, the domains of Social Interaction, Communication, and Stereotyped Behaviors.

The absence of any specific symptom would not rule out an ASD diagnosis, so long as the requisite numbers of impairments in each domain are present. Conversely, ASD cannot be diagnosed by any single abnormal behavior, but the ultimate diagnosis is based on an accumulation of symptomatic behaviors.

For a PDD-NOS diagnosis, the child must display behavioral abnormalities in all three domains. However, this diagnosis is given when the impairments fall short of the criteria required for a diagnosis of "autistic disorder." (Resp. Ex. C, p. 1275A.)

## V

## LEGAL STANDARD

The Vaccine Act provides that:

> In the case of * * * a vaccine set forth in the Vaccine Injury Table which is administered after October 1, 1988, if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the *expiration of 36 months* after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury * * *.

§ 16(a)(2) (emphasis added). In *Cloer v. HHS*, the Court of Appeals for the Federal Circuit affirmed that the statute of limitations begins to run on "the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury recognized as such by the medical profession at large." 654 F.3d 1322, 1325 (Fed. Cir. 2011)(*en banc*), *cert. denied*, 132 S. Ct. 1908 (2012). This date is dependent on when the first sign or symptom of injury appears, not when a petitioner discovers a causal relationship between the vaccine and the injury. *Id.* at 1335, citing *Markovich v. HHS*, 477 F.3d 1353, 1360 (Fed. Cir. 2007.) The date of the occurrence of the first symptom or manifestation of onset "does not depend on when a petitioner knew or should have known" about the injury. *Id.* at 1339.

## VI

## THIS CASE WAS NOT TIMELY FILED

On November 27, 2006, Petitioners filed a Short-Form Autism Petition for Vaccine Compensation on behalf of V.B. Therefore, for this petition to be timely filed within the Vaccine Act's 36-month statute of limitations, the *first symptom* of V.B.'s ASD must have occurred no earlier than November 27, 2003. In this case, however, the medical records indicate that symptoms of V.B.'s ASD likely appeared *before* that date.

### A. *Medical record notations indicating onset prior to November 27, 2003*

Among the most important medical records, in my view, are the *only contemporaneous* records prior to November 27, 2003. That is, Dr. Gregory Williams assessed V.B. on October 30, 2002, when she was eleven months old, and observed that V.B. "is not doing much in terms of motor development… [s]he is not walking, not crawling… [s]he says 'Da-Da', no other words." (Pet. Ex. A, p. 7.) This apparent expression of concern about V.B.'s development was reiterated three months later, on February 7, 2003, when Dr. Williams observed that V.B. could "[s]ay momma and dada, and baby, but a little bit slow." (Pet. Ex. A, p. 5.) He recorded his impression that "she may have a gross motor delay, it's probably mild, and *there may be a mild language delay*." (*Id.*) (Emphasis added.) Thus, it appears that Dr. Williams noticed symptoms of V.B.'s language delay, first in October of 2002, and then again in February of 2003, when she was about 14 months old; these symptoms, with the benefit of *hindsight,* were very likely part of V.B.'s ASD.

There are no contemporaneous reports in the medical record for the next 21 months, between February 2003 and November 2004. Thus, to the extent that symptoms appeared within those months, there are no *contemporaneous* medical records to document them.

10

However, the record of this case contains a number of medical records created in late 2004 and later years. These records confirm that V.B. ultimately was diagnosed with an ASD, and they also report *retrospectively* on V.B.'s symptom history. Two of those retrospective histories place the onset of ASD symptoms as occurring *prior* to the crucial date of November 27, 2003.

For example, on April 14, 2006, Dr. Pamela Hofley examined V.B. and recorded that "She has been diagnosed with autism spectrum disorder with PPD. Symptoms started to arise at about 15 months and became very apparent by age two and two and a half." (Pet. Ex. C, p. 3.) Thus, this history clearly places the onset of V.B.'s autism symptoms at age 15 months, or around March 4, 2003.

Also, V.B. saw Dr. David K. Urion on January 3, 2005, and Dr. Urion wrote the following note:

> In retrospect, early motor milestones were all achieved within the usual timeframes, but language milestones were significantly delayed. By 2 year of age, she only had a single word utterance, "mama," which was not preserved and was subsequently lost. Since that time she has essentially gained no new words * * *.

(Pet. Ex. E, p. 3.) This history clearly indicates onset of language delay *prior* to age two (December 4, 2003), and strongly suggests delay of language milestones substantially earlier, making it seem quite likely that V.B.'s language delay had its onset prior to the crucial date of November 27, 2003.

In sum, the *only contemporaneous* records, made in October of 2002 and February 2003, plus the retrospective history later recorded by Dr. Hofley placing the onset of symptoms around March 4, 2003, *clearly* place the onset of V.B.'s ASD symptoms *well prior* to the key date of November 27, 2003, which would make this petition *untimely*. Further, the retrospective history taken by Dr. Urion also strongly suggests onset prior to November 27, 2003.

### B. *Medical records notations which are neutral or ambiguous concerning this issue*

Next, there are three retrospective records which are somewhat ambiguous or neutral concerning the issue of when V.B's autism symptoms had their onset. First, Dr. Ann Neumeyer examined V.B. on June 15, 2010, and wrote that--"[A]t 12 months, she had a couple of words, but by 2.5 she didn't talk much, and she seemed to lose much of her language. (Pet. Ex. Q, p. 2.) For Dr. Neumeyer to write that "by" age 2.5 V.B. didn't talk much implies that the onset of V.B's language delay took place *sometime between* age 12 months and age 2.5. Therefore, by this history, V.B.'s onset of autism symptoms could have taken place either *prior* to November 27, 2003 (when V.B. was just seven days short of two years of age), *or* after November 27, 2003.

Second, on December 2, 2004, pediatrician Dr. Ann Dobbins noted that V.B. had "normal growth & development until about 1 year ago was speaking--now [without] speech-- [symptoms] worse in July." (Pet. Ex. D, p. 5.) Dr. Dobbins' notation, when closely examined, is therefore essentially neutral concerning the "timely filing" issue in this case. That is, her report suggests that V.B's normal growth and development" *ended*, and the beginning of her language

11

delay *began*, "about 1 year ago." (*Id.*) One year prior to Dr. Dobbins' exam would have been December 2, 2003--only five days after the crucial date of November 27, 2003. And Dr. Dobbins wrote "about 1 year," implying that the onset of V.B.'s autism symptoms could have been sometime just prior to December 2, 2003, or just after that date. Therefore, Dr. Dobbins' notation is essentially neutral concerning the issue of whether V.B.'s autism symptoms began prior to November 27, 2003.

Finally, in April of 2014, Dr. Mary Megson examined V.B., and then wrote the following note:

> Father reported she had a large number of vaccines at age 23 months premedicated with Tylenol. These included DTaP, IPV, HIB, Hepatitis B, and Pneumococcal vaccine, 11/11/2003 (23 months), after which she had slow developmental regression into autism, diagnosed at age 30 months. She began twisting her fingers. She was afraid of light and alternated between diarrhea and constipation, had night sweats, cried inconsolably, and stopped talking.

(Ex. X, p. 1.) This notation indicates that the first symptoms of ASD onset began *after* November 23, 2003, the date of the vaccinations described by Dr. Megson. If that onset was *very soon* after November 23, 2003, then it might predate the crucial date of November 27, 2003. But if the onset did not began until four or more days after the vaccinations, then the onset would have occurred *after* the crucial date. Therefore, I analyze this record as *neutral* concerning the issue of whether this petition was timely filed.

### C. *Medical records notations which would support onset <u>after</u> November 27, 2003*

Finally, there are a few records which appear to indicate that the onset of V.B.'s symptoms took place *after* the crucial date of November 27, 2003, which would make the filing of this petition *timely*.

First, on March 13, 2009, V.B. was evaluated by neurologist Shafali Jeste, who recorded as follows:

> [A]ccording to her parents [V.B.] had typical development until age 2.5 when they felt as though she profoundly regressed. Mom says that in the first 2.5 years of life she was babbling, and even had some words such as "mommy, daddy, uh-oh" and had typical motor development as well. She was social and had good eye contact, and had no repetitive behaviors. Mom says that around age 2.5 she completely stopped talking and started exhibiting many repetitive behaviors such as hand flapping and twisting her fingers.

(Pet. Ex. H, p. 2.)

Second, on May 2, 2012, Dr. Mark Korson evaluated V.B. He recorded that "[a]round the age of 2.5 years, [V.B.] demonstrated rocking behaviors, flapping of her arms, twisting of her fingers. Occurred periodically, not in response to any stimulation or trigger." (Pet. Ex. T, p. 1.)

12

Third, on December 5, 2012, Dr. Andrew Zimmerman examined V.B. and noted that "Regression took place in [V.B.] at 30 months of age with onset of crying, light sensitivity, and constipation.  There was no specific temporal relationship to vaccines (or illness) which were given according to the usual regimen at that time."  (Pet. Ex. I, p. 2.)

Fourth, when V.B. saw Dr. Katherine Sims on September 26, 2013, she wrote that V.B.'s autism symptoms started "[a]round 3 years of age."  (Ex. L, p. 1.)

I note that age 2.5 years is equal to age 30 months, and that V.B. turned 2.5 years on June 4, 2004.  Thus if these four histories are accepted, then V.B.'s first symptoms of autism began *after* November 27, 2003.

### D.  *Analysis of all medical records*

It is not easy to reconcile these contrasting histories of V.B.'s symptoms.  But after considering all of this evidence, I find that the first symptoms of V.B.'s autism were her first symptoms of *language delay*, and that it is substantially "more probable than not" that her first symptoms of language delay took place *prior* to November 27, 2003.

Most important, in my final analysis, is the existence of the *only contemporaneous* relevant records in the record of this case, the two records of Dr. Williams created on October 30, 2002, and February 7, 2003.  These records indicate clearly that on those dates, Dr. Williams was concerned about possible language delay, based upon V.B.'s behavior.  He was, of course, not *sure* at that time that V.B. would eventually be found to suffer from ASD, or anything serious at all.  But with the *benefit of hindsight*, it now appears very likely that Dr. Williams' suspicions on those dates were correct, that V.B. was in fact displaying the first symptoms of ASD at that time.

This conclusion is strongly supported by the notation of Dr. Pamela Hofley on April 14, 2006.  After being told on that date of V.B.'s symptom history, Dr. Hofley wrote unequivocally that V.B.'s symptoms of ASD "started to arise at about 15 months and became very apparent by age two and two and a half."  (Pet. Ex. C, p. 3.)  Moreover, her date of onset at "about 15 months" roughly coincides with the symptoms noted by Dr. Williams on February 7, 2003, when V.B. had just passed 14 months of age.

Also very important is Dr. Urion's record of January 3, 2005, when he wrote the following history:

> In retrospect, early motor milestones were all achieved within the usual timeframes, but language milestones were significantly delayed.  By 2 years of age she only had a single word utterance, "mama," which was not preserved as subsequently lost.  Since that time she has essentially gained no new words * * *.

(Pet. Ex. E, p. 3.)  This history clearly indicates onset of language delay *prior* to age two.  And, since V.B. turned age two on December 4, 2003, this statement strongly suggests language delay

13

substantially earlier, making it seem quite likely that V.B.'s language delay had its onset *prior* to the crucial date of November 27, 2003.

Of course, I have not failed to consider the other retrospective histories mentioned above at pp. 11-13, some of which, as noted, are neutral on this issue, but some of which are *contrary* to my conclusion. Specifically, in the four histories cited at pp. 12-13, Drs. Jeste, Korson, Zimmerman, and Sims reported that they had been told, obviously by V.B.'s parents, that her first symptoms of ASD occurred at age 2.5 years (the same as 30 months of age) or around age 3 years. But I note that those four histories were taken in 2009 (Dr. Jeste) and 2012 (Drs. Korson, Zimmerman, and Sims). In contrast, the medical records that I find persuasive were either made *contemporaneously* in 2002 and 2003, or on dates *much earlier* (January 3, 2005, and April 14, 2006) than the four histories recorded in 2009 and 2012. I find that the reports made by V.B.'s parents at *earlier* dates are more reliable than reports that they made on *later* dates. Memories dim as time passes. Further, *all* of the four reports of later onset dates were made *after this case was filed*, when Petitioners might have been aware of a possible "timely filing" problem. Indeed, the last three reports, each recorded in 2012, were recorded after Respondent had filed a motion on July 1, 2009, asserting that this case was *untimely* filed.

Accordingly, for all the reasons discussed above, I find that it is "more probable than not" that V.B. displayed symptoms of autism *prior* to November 27, 2003, so that this case was *untimely filed*.

## VII

## THE PETITIONERS DO NOT QUALIFY FOR RELIEF UNDER THE "EQUITABLE TOLLING" DOCTRINE IN THIS CASE

The Petitioners, in their latest memorandum concerning the timely filing issue, filed on September 18, 2014 (ECF #66), make a brief, unpersuasive argument that their petition was timely filed. However, they also note that under *Cloer v. HHS*, 654 F.3d 1322, 1340 (Fed. Cir. *en* banc 2011), the doctrine of "equitable tolling" is available to a petitioner whose petition was not timely filed. Their main argument in their response, therefore, is that if this petition is deemed untimely filed, nevertheless their untimely filing of this petition should be *excused* under that doctrine. Petitioners note that they have six children, three of whom have autism, and that they were acting *pro se* when they filed Vaccine Act petitions on behalf of their three autistic children. They argue that these family circumstances constitute "extraordinary circumstances," and that they acted diligently. (ECF #66, pp. 2-3.)

I begin by noting my great sympathy for the immense challenges faced by the Bevill family. It obviously *does* constitute "extraordinary circumstances," in the ordinary usage of those words, for a family to have six children, three of whom suffer from ASDs.

However, I must decide this issue not based upon sympathy, but by examining the controlling law. Based upon that examination, it appears to me that the circumstances faced by the Bevill family, though certainly constituting "extraordinary circumstances" in one sense, do *not* qualify them for relief under the "equitable tolling" doctrine in this case.

14

The short summary of my analysis is that the controlling case law indicates that not all "extraordinary circumstances" justify application of the "equitable tolling" doctrine. That doctrine is applicable in only two types of very limited circumstances--and the unfortunate circumstances of the Petitioners in this case do *not* fall within those two very limited types.

In *Cloer*, the Federal Circuit's discussion, concluding that the equitable tolling doctrine does apply to cases in which a Vaccine Act petition was untimely filed, noted that "any analysis" of equitable tolling under federal law "begins with *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990)." 654 F.3d at 1341. I conclude that *Irwin* is determinative concerning the issue of *what type* of "extraordinary circumstances" justify an application of the "equitable tolling" doctrine. In *Irwin*, the Court opined that equitable tolling is to be used "sparingly" in federal cases, and has been limited to cases involving (1) deception, or (2) the *timely* filing of a procedurally defective pleading. Specifically, the *Irwin* Court stated that:

> Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.

498 U.S. at 96. Clearly, the circumstances of this case do *not* fit within either of the two types of situations described by the Court in *Irwin*. Petitioners do *not* allege either that the Respondent engaged in any deception or trickery resulting in their missing their filing deadline, or that they filed some kind of defective pleading *during* the statutory limitations period, such as a petition filed in the wrong court.

Indeed, the general criteria applicable to a claim for equitable tolling were well-established by the U.S. Court of Appeals for the Federal Circuit, long before the ruling in *Cloer*. In *Leonard v. Gober*, 223 F.3d 1374, 1375-76 (Fed. Cir. 2000), *cert. denied*, 531 U.S. 1130 (2001), the Federal Circuit noted that equitable tolling of a statute of limitations is allowed when Petitioners contend that--

> the claimant has actively pursued his judicial remedies "by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. DVA*, 498 U.S. 89, 96 (1990).

Likewise, in *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003), c*ert. denied*, 540 U.S. 1177 (2004), the court opined that:

> Our cases, like the Supreme Court's decision in *Irwin*, make clear that equitable tolling against the federal government is a narrow doctrine. As the Supreme Court noted in *Irwin*, mere excusable neglect is not enough to establish a basis for equitable tolling; there must be a compelling justification for delay, such as "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 96.

*Martinez*, 333 F.3d at 1318. Thus, pursuant to rulings in the Federal Circuit, as in *Irwin*, equitable tolling is applicable when one of two situations have been met--either the petitioners were deceived or tricked, or they filed a defective pleading *within* the statutory time period.

In the context of Vaccine Act cases, there are few decisions addressing the issue of whether the equitable tolling doctrine may excuse an untimely petition filing. This is because up until the date of the 2011 ruling in *Cloer*, the Federal Circuit's ruling was that "equitable tolling" was *not* available in cases in which Vaccine Act petitions were untimely filed. See *Brice v. HHS*, 240 F.3d 1367 (Fed. Cir. 2001), overruled in *Cloer,* 654 F.3d at 1340. A few decisions issued since *Cloer,* however, have recognized the limited application of "equitable tolling" in Vaccine Act cases.

For example, in *Wax v. HHS*, No. 03-2830V, 2012 WL 3867161 (Fed. Cl. Spec. Mstr. Aug. 7, 2012) then-Special Master Patricia Campbell-Smith (now Chief Judge of this court) found that a petition had been untimely filed, and considered an argument that such untimely filing should be excused under the equitable tolling doctrine. The *Wax* petitioners argued that confusion about the law, as to where and when they needed to file a Vaccine Act petition, entitled them to relief under the equitable tolling doctrine. Special Master Campbell-Smith denied the equitable tolling claim. 2012 WL 3867161 at *9-14. Her ruling was affirmed in *Wax v. HHS*, 108 Fed. Cl. 538, 541-43 (2012). The judge in *Wax,* citing *Irwin*, noted that, unlike the situation posited in *Irwin,* in which a plaintiff filed a *timely* petition but in the wrong court, the *Wax* petitioners had filed an *untimely* petition in the wrong court, and thus were not entitled to relief under the equitable tolling doctrine. (*Id*. at 542.)

Similarly, other special masters have rejected a petitioner's plea for equitable tolling relief in the context of an untimely filed petition. See, *e.g., Maack v. HHS*, No. 12-354V, 2013 WL 4718924, at *4-6 (Fed. Cl. Spec Mstr. Aug. 6, 2013). And, in a case quite similar to this one, *Anderson v. HHS*, No. 12-016V, 2013 WL 691003 (Fed. Cl. Spec. Mstr. Jan. 29, 2013), the petitioner alleged that a vaccination caused her to suffer an aggravation of her preexisting chronic illness. The petitioner claimed that she should receive equitable relief from the petition filing deadline because, among other reasons, "her family situation was an extraordinary circumstance." (*Id*. at *4.) That circumstance involved raising two children while beset with difficulties caused by her own illness. (*Id*. at *4.) However, the special master, citing *Irwin,* opined that the petitioner's family circumstances were "not the type of circumstances recognized to be extraordinary for the purpose of applying equitable tolling." (*Id.* at *5.)

In the face of the case law cited above, Petitioners cite *Mojica v. HHS*, 102 Fed. Cl. 96 (2011), in support of their request for equitable tolling. (ECF #66, p. 2.) The *Mojica* case involved a claim for equitable relief from judgment, pursuant to RCFC 60(b). The extraordinary circumstance alleged in *Mojica* was that a courier service had lost the petition twice, before delivering it, finally, several days after the statute of limitations had expired. (102 Fed. Cl. at 96-97.) The *Mojica* court concluded that the petitioners had made diligent efforts and had taken reasonable steps to file a timely claim, but were thwarted by the "extraordinary" failures of the courier service. (*Id*. at 100.) To resolve whether such failure by a courier service was sufficient to justify the application of equitable tolling, the *Mojica* court examined rulings on this issue in five different federal appellate courts, which all favored a grant of relief. The court, therefore, granted relief. (*Id*. at 101.) However, in citing the *Mojica* case, the Petitioners in this case do

16

*not* assert that they attempted to file *within* the statutory period, only to be thwarted by a delivery failure*,* as in *Mojica*. Thus, the rationale of *Mojica* is not applicable to this case.

Petitioners have also cited the opinion in *Price v. HHS,* 565 Fed. Appx. 891 (Fed. Cir. 2014). (ECF #66, p. 2.) But in that case, which involved equitable tolling in a Vaccine Act case but in a different context, the plea for equitable tolling was *not* found to be appropriate.

Finally, Petitioners cite *Askew v. HHS*, No. 10-767V, 2012 WL 2061804 (Fed. Cl. Spec. Mstr. May 17, 2012), for the general proposition that *pro se* petitioners "should be entitled to some relaxation of the standards applicable to attorneys." (ECF #66, p. 3.) I fully agree with that general proposition, and in fact, I myself always give *pro se* petitioners much more leeway than I would an attorney, concerning *procedural* matters. However, the facts in *Askew* were much different than the facts here. In *Askew* the petitioners *did* mail their petition in a *timely* fashion--they simply addressed it to the Respondent instead of this court. 2012 WL 2061804 at *4. Thus, as the special master concluded, the facts of *Askew* fell *precisely* into one of the two specific categories set forth in *Irwin*--"the claimant has actively pursued his judicial remedies by filing a defective pleading *during the statutory period*." 498 U.S. at 457-58 (emphasis added). In this case, the Petitioners do *not* claim that they mailed a petition concerning V.B. to *anyone* during the statutory period.

Thus, for all the reasons *set* forth above, Petitioners' request for application of the equitable tolling doctrine in this case must be denied, under the binding case law of *Irwin*.

## VIII

## VIABILITY OF PETITIONERS' CLAIM

Of course, as noted above, I am very sympathetic to Petitioners' situation. It is heartbreaking to contemplate a family dealing with the immense challenges of caring for three children with ASDs, while also raising three other children. Yet I must rule based upon the applicable law, not on emotion.

I also note that any other ruling concerning the equitable tolling claim in this case would raise large issues, and possibly, in essence, largely eliminate the filing deadline for most Vaccine Act cases. The fact is that virtually all Vaccine Act petitions involve vaccinees with serious injuries. A great many cases involve families with children who have horrendous medical conditions. If a family with three autistic children can gain, in effect, a waiver of the timely filing rules, should not families with even *one* badly handicapped child also be exempted? Should *adult* petitioners/vaccinees with a serious injury also be exempted? Allowing "equitable tolling" because a vaccinee and his/her family face immense burdens is intuitively appealing, but it is not clear where the cut-off point for such a tolling doctrine would be established.

Further, at p. 2 of this Decision, I note that in six "test cases," despite great efforts, petitioners' attorneys were able to provide *no plausible evidence* linking *any vaccine* causally to *autism*. And, in several additional cases involving autistic children, decided since the test cases, the vaccine-causation arguments of the petitioners have uniformly been rejected as *very* weak. *See, e.g., Waddell v. HHS*, No. 10-316V, 2012 WL 4829291 (Fed. Cl. Spec. Mstr. Campbell-Smith Sept. 19, 2012) (autism not caused by MMR vaccination); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR

vaccination); *Henderson v. HHS,* No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Franklin v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V (Fed. Cl. Spec. Mstr. Hastings Feb. 9, 2015) (autism not caused by influenza vaccine).

Accordingly, even if I were to utilize the "equitable tolling" doctrine to waive the timely filing requirement in this case, it does not appear likely that the Petitioners' could thereafter successfully show that V.B.'s autism was vaccine-caused or vaccine-aggravated.

## IX

## CONCLUSION

The record of this case demonstrates plainly that V.B. and her family have been through a tragic ordeal. I have studied the records describing V.B.'s medical history, and the efforts of her family in caring for her. Based upon those records, the great dedication of V.B's family to her welfare is readily apparent to me.

Nor do I doubt that V.B.'s parents are sincere in their belief that V.B.'s vaccinations played a role in V.B.'s autism. V.B.'s parents very likely have heard the opinions of physicians who profess to believe in a causal connection between vaccines and autism. After studying the extensive evidence in the autism test cases described above, I still have seen no plausible evidence that there is a causal connection between any vaccinations and autism. Nevertheless, I can understand why V.B.'s parents found such a physician's opinion to be believable under the circumstances. I conclude that the Petitioners filed this petition in good faith.

Thus, I feel deep sympathy for the Bevill family. Further, I find it unfortunate that my ruling in this case means the Program will not be able to provide funds to assist this family, in caring for their child who suffers from a serious disorder. It is my view that our society does not provide enough assistance to families of *all* autistic children, regardless of the cause of their disorders. And it is certainly my hope that our society will find ways to ensure that in the future *much* more generous assistance is available to all such children. These families must cope every day with tremendous challenges in caring for their autistic children, and all are deserving of sympathy and admiration. However, I must decide this case not on sentiment, but by analyzing the evidence. Congress designed the Program to compensate only petitioners who timely filed their Vaccine Act petitions. The Petitioners in this case did not do so. Accordingly, I conclude that this petition must be dismissed for untimely filing.[12]

**IT IS SO ORDERED.**

---

[12] In the absence of a timely filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.

18

<u>/s/ George L. Hastings, Jr.</u>
George L. Hastings, Jr.
Special Master